UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOURCING UNLIMITED, INC. d/b/a JUMPSOURCE,<br><br>Plaintiff,<br><br>v.<br><br>ELEKTROTEKS, LLC, SERKAN GULER, JOHN E. FOX, INC., HARRY BERZACK, POLANCO INDUSTRIAL CORP., FABIO SYRING and SETH SERVICE-MANUTENACAO E COMERCIO DE EQUIPAMENTOS LTDA,<br><br>Defendants. | \*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*      Civil Action No. 20-cv-11955-ADB |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Sourcing Unlimited, Inc. d/b/a Jumpsource, ("Jumpsource") asserts several

claims against Elektroteks, LLC ("Elektroteks"), Serkan Guler ("Guler"), John E. Fox, Inc.

("Fox"), Harry Berzack ("Berzack"), Polanco Industrial Corp. ("Polanco Corp."), Fabio Syring

("Syring"), and Seth Service-Manutenacao E Comercio De Equipamentos LTDA ("Seth

Service" and, together with Elektroteks, Guler, Fox, Berzack, Polanco Corp., and Syring,

"Defendants"). Jumpsource's claims stem from an alleged scheme, carried out by Defendants

and non-parties, to sabotage and bankrupt Jumpsource. [ECF No. 1 at 12–57 ("Compl.")].

Currently before the Court are (1) Berzack and Fox's motion to dismiss, [ECF No. 8]; (2)

Elektroteks and Guler's motion to dismiss, [ECF No. 13]; and (3) Berzack and Fox's motion to

strike exhibits appended to Jumpsource's opposition brief, [ECF No. 21]. For the reasons set

forth below, the motions to dismiss are <u>GRANTED</u> in part and <u>DENIED</u> in part, and the motion to strike is <u>DENIED</u>.

## I.    BACKGROUND

### A.    Factual Background

The following facts are taken from the complaint, [Compl.], the factual allegations of which are assumed to be true when considering a motion to dismiss.  <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).

Jumpsource is a corporation that manufactures and sells sewing machine parts.  <u>See</u> [Compl. ¶ 16].  Michael Porter ("Porter") founded Jumpsource in 2000 and serves as its president.  [<u>Id.</u> ¶¶ 16–17].  The parts that Jumpsource makes are replicas of parts made by other companies, and, in most cases, Jumpsource is the only source for the parts, other than the original equipment manufacturers ("OEMs").  [ECF No. 13 at 2; Compl. ¶ 23].  Jumpsource designed and tested the molds it uses to make these parts in China and spent more than $1 million doing so.  [Compl. ¶¶ 18–20].

In 2015, Jumpsource invested about $75,000 to develop an aluminum casting mold to produce a sewing machine head, called the Pfaff 5625, which was originally sold by a German company.  [Compl. ¶ 35].  Jumpsource also invested "substantial funds" to develop a new "flange" sewing machine, which could be used in mattress manufacturing.  [<u>Id.</u>].

#### 1.    The Enterprise

At the core of its complaint, Jumpsource asserts that Defendants, along with several non-parties, formed an "association-in-fact" enterprise that conspires to bankrupt Jumpsource by (1) converting and misappropriating Jumpsource's molds, parts, designs, and plans for the Pfaff 5625 and flange machine; (2) selling stolen parts and parts made from Jumpsource's stolen

molds in foreign and interstate commerce; and (3) converting and misappropriating Jumpsource's customer lists, contact information, and copyrighted photos. [Compl. ¶¶ 188–89]. The enterprise consists of the following individuals and entities:

- Non-party Anson Fang ("Fang"). Fang was a Jumpsource employee who ran Jumpsource's Chinese operations for approximately eight years. [Compl. ¶ 25]. As part of his duties, Fang managed order shipments and oversaw the factories that housed Jumpsource's molds. [Id.]. Fang now uses the company Shanghai HUB International Trading Co. LTD to distribute, in interstate and foreign commerce, parts stolen from Jumpsource or parts made from stolen Jumpsource molds. [Id. ¶ 15].

- Non-party Peng Hongchun ("Peng"). Peng was the spare parts manager for Jumpsource and worked there until fall 2016. [Id. ¶ 10]. He is now Fang's "associate." [Id.].

- Non-party Michael Pierce ("Pierce"). Pierce owns and operates M.J. Pierce Distributor ("M.J. Pierce"). [Id. ¶¶ 13–14, 32–33]. M.J. Pierce regularly purchased Jumpsource parts to resell to its customers. [Id. ¶ 33]. Pierce and M.J. Pierce now distribute parts in interstate and foreign commerce for Elektroteks. [Id. ¶ 14].

- Non-party Joselito Polanco ("Polanco"). Polanco was a Jumpsource employee until October 17, 2016 and was the principal salesperson in Jumpsource's Beverly, Massachusetts office. [Id. ¶ 28]. In Beverly, Polanco was assisted by other Jumpsource employees, Dina Morneau ("Morneau") and Virgen "Millie" Cruz ("Cruz"). [Id. ¶ 30]. As part of their responsibilities, Polanco, Cruz, and Morneau interacted with Jumpsource customers, including M.J. Pierce. [Id. ¶ 31]. Polanco now sells parts and machines for Elektroteks. [Id. ¶ 12]. In 2016, Polanco also

started Polanco Corp., which distributes machine parts for Elektroteks and M.J. Pierce. [Id. ¶¶ 6, 162–63]. Polanco continues to live and work in Massachusetts. [Id. ¶ 2].

- Guler is the CEO of Elektroteks, a company that manufactures and sells machinery used in the bedding and textile industries. [Id. ¶¶ 50–52]. Elektroteks became a Jumpsource customer around 2014. [Id. ¶ 53].[1]

- Berzack is the CEO of Fox, a fulfillment company that purchases parts and resells them to customers in the textile business. [Id. ¶¶ 5, 63–64]. For years, Fox purchased Jumpsource's sewing machine parts and resold those parts to its own customers. [Id. ¶ 64].

- Syring was a Jumpsource employee from approximately 2015 through May 2016. [Id. ¶¶ 7–8]. He is now the "Manager of Brazil" for Elektroteks and also conducts business through Seth Service, a Brazilian company. [Id.].

    2.    The Scheme to Defraud and Divert Sales from Jumpsource

In 2015, members of the enterprise took steps to gain control of Jumpsource's molds and parts. On October 27, 2015, Fang emailed Polanco and Morneau to tell them he had placed Jumpsource's molds in his warehouse in China. [Compl. ¶ 38]. Next, Fang, with the help of Peng, transferred Jumpsource's molds into the factories of vendors they had selected, and also purchased Jumpsource's entire inventory of specially made parts. [Id. ¶¶ 42–43].

Over the next year, Fang, Peng, and Polanco continued scheming to sabotage Jumpsource and gain control of its molds and inventory. [Compl. ¶¶ 44–45]. As part of this scheme, they

---

[1] The complaint also states that Elektroteks was organized as a limited liability company on September 1, 2017. [Id. ¶ 2].

would tell Jumpsource to order parts to fulfill customer requests, but Jumpsource would never receive the parts. [Id. ¶ 46]. Instead, Fang and Polanco would "take control" of the parts that Jumpsource had already paid for. [Id.]. Pierce, who was brought into the scheme by Polanco, would also sell parts manufactured by Fang using the molds stolen from Jumpsource. [Id. ¶ 47]. Pierce was aware that Fang, Peng, and Polanco were diverting orders from Jumpsource and then using molds stolen from Jumpsource to fill the orders. [Id. ¶ 48]. As a result of these efforts, Polanco's sales for Jumpsource fell from $923,000 in 2015 to $350,000 in 2016. [Id. ¶ 155].

In April 2016, in another attempt to divert sales and deplete Jumpsource's inventory, Polanco asked Jumpsource to send parts to an individual named Rigoberto Lima, who worked for a company called Maqplan. [Compl. ¶¶ 100, 102]. Jumpsource sent $50,000 worth of parts to Lima. [Id. ¶ 101]. Lima did not pay Jumpsource for the parts, and Jumpsource asked Polanco to demand that Lima pay for and/or return the parts. [Id. ¶¶ 103–04]. Polanco refused to do so. [Id. ¶ 104]. Lima never paid for the parts or returned them to Jumpsource. [Id. ¶ 106]. During this same period, Elektroteks and Fox placed orders with M.J. Pierce, Fang, and Polanco, for the same parts that were sent to Lima. [Id. ¶ 107].

From May 3, 2016 to September 8, 2016, Fang asked Jumpsource to pay for parts that would be used to fulfill orders. [Compl. ¶ 80]. Based on those requests, Jumpsource wired $53,629 to Fang to pay for parts, but those orders were never actually fulfilled. [Id. ¶¶ 79–80, 82]. Jumpsource, also at Fang's request, wired $5,782 to a company called "LG" for work on developing the flange machine and the Pfaff 5625. [Id. ¶ 80]. The wiring information provided by Fang to Jumpsource was incorrect and did not actually correspond to LG. [Id.].

On September 29, 2016, Fang emailed Morneau, Polanco, and Cruz, copying Porter, to notify them that he no longer worked at Jumpsource. [Compl. ¶ 87]. Fang told Morneau,

Polanco, and Cruz that he would not ship any more parts to the Beverly office for them and that they should no longer contact him. [Id.]. Fang's email also explained that Jumpsource "has been written off for many years," was sued by its vendors, and did not have any parts. [Id.]. Polanco responded, "[w]hat is going on . . . this is not good news guys!" [Id. ¶ 88]. Jumpsource asserts that when Polanco sent this email, he was already aware of and involved in the scheme to steal Jumpsource's molds and to divert sales. [Id. ¶ 89]. Jumpsource contacted Fang after receiving his email and demanded to know where the molds were. [Id. ¶ 92]. Fang responded that the molds were in different factories and that Porter would never be able to locate them. [Id. ¶ 93].

At the same time that Fang sent his email notifying Polanco of his resignation, Berzack emailed Morneau to cancel Fox's outstanding orders with Jumpsource. [Compl. ¶ 91]. Jumpsource told Berzack that it had already paid for the parts to fulfill Fox's orders, which Fang had failed to deliver, and if Berzack accepted parts paid for by Jumpsource, he would be accepting stolen property. [Id. ¶¶ 94–95]. Jumpsource also told Berzack that Jumpsource, not Fang, owned the molds that made the parts for Berzack. [Id. ¶ 94].

Berzack said that he would buy parts from another source and not from Fang, but Berzack did proceed to buy the stolen parts from Fang. [Compl. ¶¶ 96–97]. Several years after the 2016 incident, Berzack admitted to buying parts from a "Jumpsource supplier," but with the belief that the molds were owned by that supplier. [Id. ¶ 98]. Prior to Fang's theft of the molds, however, Jumpsource and the OEMs were the only sources for these parts. [Id. ¶ 23]. Accordingly, Jumpsource asserts that the supplier must have been Fang using the stolen molds. See [id. ¶ 23; ECF No. 17 at 7 n.5]. Fox continues to purchase parts made with Jumpsource's stolen molds and resells and distributes those parts in interstate commerce. [Compl. ¶ 190(m)].

On October 17, 2016, Polanco notified Jumpsource that he too was quitting. [Compl. ¶ 124]. That same day, an email on behalf of Pierce and Polanco was sent to Jumpsource customers to inform them that Polanco and Pierce would now be selling parts and that Jumpsource was unable to deliver parts. [Id. ¶¶ 141–42].

After Polanco quit, Jumpsource discovered that its Beverly office was damaged and that approximately $50,000 in parts, a dolly, and employee agreements that were stored in a locked file cabinet had been stolen. [Compl. ¶¶ 125–27]. The stolen parts would be valuable only to someone in the business of selling machine parts and the employee agreements would be valuable only to the employee named in each contract. [Id. ¶ 137]. Four years' worth of business information was also deleted from Jumpsource's server. [Id. ¶ 128]. There is no evidence that someone broke into the office to commit the theft. [Id. ¶ 127]. At the time of the theft, Fang was in the Boston area and he had the technical skills to delete information from a server. [Id. ¶ 129]. An attorney for Pierce later told Jumpsource's counsel that Pierce had parts that were removed from Jumpsource's office and intended to pay for them, although he never did. [Id. ¶¶ 135–136].

When Polanco left Jumpsource, he, Fang, Pierce, and Peng were in possession of approximately $400,000 worth of parts that Jumpsource had paid for and also had the proprietary development plans for the Pfaff 5625 and flange sewing machine. [Compl. ¶¶ 157–58].[2]

---

[2] Jumpsource describes other October 2016 emails and invoices sent from Polanco and Pierce to Jumpsource customers as examples of other attempts to divert business from Jumpsource. [Compl. ¶¶ 145–55]. Jumpsource also alleges facts related to invoices from a Chinese company, Wuxi Textiles, that it obtained from discovery in a related matter pending in Essex County Superior Court. [Id. ¶¶ 109–21]. These invoices are purportedly fake, show connections between M.J. Pierce, Fang, and Polanco, and reflect orders for parts that Jumpsource had paid for in order to fulfill orders from Fox and future orders from Elektroteks. [Id. ¶¶ 113, 121].

3.     <u>Conduct by Guler and Elektroteks</u>

During the course of Elektroteks' relationship with Jumpsource, Guler learned of Jumpsource's development of the Pfaff 5625 and the flange sewing machine and indicated that he would purchase 60 of the Pfaff 5625s from Jumpsource for $330,000.  [Compl. ¶¶ 54–55]. Guler and Jumpsource began negotiating a potential deal whereby Jumpsource would be an agent or partner of Elektroteks in the sale of parts and machinery in Central America, South America, and parts of the Middle East.  [<u>Id.</u> ¶¶ 59–60].  Jumpsource created a new business plan based on this potential relationship with Elektroteks and its interest in the Pfaff 5625.  [<u>Id.</u> ¶ 61]. Porter shared this new business plan with Polanco, who was employed at Jumpsource at the time, and introduced him to Guler.  [<u>Id.</u> ¶ 62].  Jumpsource believes that Elektroteks, through its association with Fang or Polanco, has been given or promised technical information regarding Jumpsource's development of the Pfaff 5625 and the flange sewing machine.  [<u>Id.</u> ¶¶ 179, 190(j)].

After Polanco left Jumpsource, he began associating with Elektroteks and Guler.  At one point, Polanco's LinkedIn profile described him as the "Owner/sales executive" of Polanco Corp., an independent representative of Elektroteks and a distributor for M.J. Pierce.  [Compl. ¶ 176].  Polanco's LinkedIn profile currently lists him as "General Manager North & South America" for a company called "Elektroteks Mattress Machinery."  [<u>Id.</u> ¶ 177].  Through this association with Polanco and Polanco Corp., Elektroteks purchases and sells parts made from the stolen Jumpsource molds.  [<u>Id.</u> ¶ 190(k)].  Elektroteks has also purchased parts it knows were stolen from Jumpsource.  [<u>Id.</u> ¶ 190(i)].

In March 2018, at a trade show in Charlotte, North Carolina, Porter saw Polanco selling specially made Jumpsource parts at a table located outside of the Elektroteks booth.  [Compl.

¶ 164]. The parts had the embossed "j" on them, which is a propriety feature of some of Jumpsource's molds. [Id.]. Polanco was also seen with Syring at that same trade show. [Id. ¶ 165]. After the tradeshow, Jumpsource learned that Polanco was working as an agent of both M.J. Pierce and Elektroteks. [Id. ¶ 166].

In 2018 and 2019, Porter traveled to South America and saw that some parts sold by Syring, Polanco, and Elektroteks had the embossed "j" on them and some parts had Jumpsource's logo. [Compl. ¶ 167]. Other parts being sold by Syring, Polanco, and Elektroteks could have only been made with Jumpsource's stolen molds. [Id.]. On or around September 10, 2019, Jumpsource's counsel contacted Guler about Elektroteks' business relationship with Polanco, including its purchase and sale of parts made using Jumpsource's stolen molds, and also about whether Elektroteks was purchasing parts from Fang that were stolen from Jumpsource. [Id. ¶ 168]. Elektroteks' counsel denied that Elektroteks had any business relationship with Fang or Polanco and said that the company used its own suppliers. [Id. ¶ 169].

In or around fall 2019, Porter saw that Syring's Facebook page and website included images "misappropriated" from Jumpsource's website, including an image of specially made Jumpsource parts, and an image of Polanco and Syring sitting with each other. [Compl. ¶¶ 170–74]. Photos on Syring's website identify Polanco as Elektroteks' "Manager for Americas" and Syring as Elektroteks' Brazil manager. [Id. ¶ 175]. Porter told Guler about the content on Syring's website and that Jumpsource parts were being sold by Elektroteks to customers in South America. [Id. ¶ 191]. During that conversation, Guler did not deny doing business with Polanco and Fang and said "things change." [Id.].

### 4.    Defamatory Statements about Jumpsource

In January 2018, Guler met with an individual named Wayne Freeman ("Freeman") to discuss the sale of machinery. [Compl. ¶ 180]. During this meeting, Guler called Polanco, who told Freeman that Porter and his sons "were no good," had nothing to sell, and were "out of business." [Id.]. About two years later, in March 2020, Freeman emailed Elektroteks requesting a proposal for certain parts. [Id. ¶ 181]. Jumpsource had also provided Freeman with a quote for the parts. [Id.]. On March 5, 2020, Guler told Freeman that Polanco was general manager for Elektroteks in the Americas and that he would assist Freeman. [Id. ¶ 182]. Shortly after the email, Cruz, now an employee of M.J. Pierce, contacted Freeman and also told him that Jumpsource was out of business and could not deliver parts. [Id. ¶ 183]. Beyond these instances, Porter has heard Guler and Polanco tell potential customers that Jumpsource is defunct and unable to provide parts. [Id. ¶ 186].

### 5.    The Fox Non-Circumvention Agreement

On November 10, 2015, Fox and Jumpsource entered into a Non-Circumvention Agreement (the "Fox NCA"). [Compl. ¶¶ 67–68]. This agreement stemmed from Berzack's request that Fox receive its orders directly from Fang in China, rather than going through Jumpsource's Beverly office, which caused delays. [Id. ¶¶ 65–67]. Before giving Fang's identity and contact information to Fox, Jumpsource wanted to ensure that the information would not be disclosed. [Id. ¶ 67]. Accordingly, the Fox NCA prohibited Fox from using information disclosed to it pursuant to the Fox NCA (including Fang's identity) and from purchasing specially made Jumpsource parts from any other source. [Id. ¶¶ 67–68]. After entering into the Fox NCA, Jumpsource authorized Fang to ship orders directly to Fox. [Id. ¶¶ 68–69]. In or

around November 2015, Fang also requested Fox's contact information which Jumpsource provided pursuant to the terms of the Fox NCA.  [Id. ¶ 70].

## B. Procedural Background

Jumpsource originally filed suit in the Essex County Superior Court on September 28, 2020.  [Compl. at 57].  Elektroteks, Guler, Fox, and Berzack removed the case to this Court on October 30, 2020.  [ECF No. 1].  Jumpsource's complaint asserts the following eleven claims: (1) Racketeering in violation of the federal civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against all defendants (Count I), [Compl. ¶¶ 194–220]; (2) Use of income derived from a pattern of racketeering activity in violation of the federal civil RICO statute, 18 U.S.C. § 1962(a), against all defendants (Count II), [id. ¶¶ 221–33]; (3) Conspiracy in violation of the federal civil RICO statute, 18 U.S.C. § 1962(d), against all defendants (Count III), [id. ¶¶ 234–44]; (4) Conspiracy to commit a business tort against all defendants (Count IV), [id. ¶¶ 245–49]; (5) Conversion against Polanco Corp., Elektroteks, Guler, Fox, and Berzack (Count V), [id. ¶¶ 250–53]; (6) Chapter 93A against all defendants (Count VI), [id. ¶¶ 254–69]; (7) Misappropriation of trade secrets in violation of Massachusetts General Laws Chapter 93 § 42 against Elektroteks and Guler (Count VII), [id. ¶¶ 270–73]; (8) Breach of contract and the covenant of good faith and fair dealing against Fox (Count VIII), [id. ¶¶ 274–81]; (9) Common law trademark infringement against all defendants (Count IX), [id. ¶¶ 282–92]; (10) Interference with advantageous relations against all defendants (Count X), [id. ¶¶ 293–96]; and (11) Defamation against Polanco Corp., Guler, and Elektroteks (Count XII),[3] [id. ¶¶ 297–304].

---

[3] The complaint does not contain a Count XI and instead skips from Count X to Count XII.

Berzack, Fox, Elektroteks, and Guler have moved to dismiss all claims asserted against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  [ECF Nos. 8 (Fox and Berzack's motion), 8-1 (Fox and Berzack's brief), 13 (Elektroteks and Guler's motion), 14 (Elektroteks and Guler's brief)].  Jumpsource opposed both motions on January 15, 2021.  [ECF Nos. 17 (opposition to Fox and Berzack), 18 (opposition to Elektroteks and Guler)].  Berzack and Fox have also moved to strike three exhibits attached to Jumpsource's opposition to their motion to dismiss, [ECF No. 21], which Jumpsource opposes, [ECF No. 22].[4]

## II.     LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in

---

[4] Polanco Corp., Seth Service, and Syring have not filed motions to dismiss or otherwise answered the complaint.

isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting

Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard

invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir.

2013) (citing Grajales, 682 F.3d at 45). First, the Court "must separate the complaint's factual

allegations (which must be accepted as true) from its conclusory legal allegations (which need

not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir.

2012)). Second, the Court "must determine whether the remaining factual content allows a

'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting

Morales-Cruz, 676 F.3d at 224).

## III.      DISCUSSION

### A.      Count I: Pattern of Racketeering Activity, 18 U.S.C. § 1962(c)

Berzack, Fox, Guler, and Elektroteks argue that Count I, the substantive RICO count,

must be dismissed because Jumpsource has not (1) alleged a pattern of racketeering activity; (2)

pled its fraud claims with the required specificity and has therefore failed to allege a predicate

act; or (3) sufficiently pled the existence of an enterprise. [ECF No. 8-1 at 4–8; ECF No. 14 at

3–8].

"To state a claim under section 1962(c), a plaintiff must allege each of the four elements

required by the statute: (1) conduct (2) of an enterprise, (3) through a pattern (4) of racketeering

activity." Soto-Negron v. Taber Partners I, 339 F.3d 35, 38 (1st Cir. 2003) (quoting N. Bridge

Assocs., Inc. v. Boldt, 274 F.3d 38, 42 (1st Cir. 2001)). Although it is a close call, as described

below, Jumpsource has pled facts sufficient to state a claim under § 1962(c).

1.    Pattern of Racketeering Conduct

To establish a pattern of racketeering activity, a plaintiff must allege at least two

predicate acts of racketeering activity, and must demonstrate that "the predicates are related, *and*

that they amount to or pose a threat of continued criminal activity." N. Bridge Assocs., Inc., 274

F.3d at 42 (emphasis in original) (internal quotations and citation omitted).  As the First Circuit

explained

> [a]cts are related if they have the same or similar purposes, results, participants,
> victims, or methods of commission, or otherwise are interrelated by distinguishing
> characteristics and are not isolated events.  Continuity requires that the related
> predicates amount to or pose a threat of continued criminal activity.  Plaintiffs may
> satisfy the continuity requirement either by evidence of a series of related predicates
> extending over a substantial period of time, or by evidence that the acts include a
> specific threat of repetition extending indefinitely into the future or form part of an
> ongoing entity's regular way of doing business . . . .

Soto-Negron, 339 F.3d at 38 (internal quotation marks and citations omitted).  A

violation of the National Stolen Property Act ("NSPA"), 18 U.S.C. §§ 2314 and 2315, is

a predicate act that can trigger the RICO statute.  18 U.S.C. § 1961(1) (listing 18 U.S.C.

§§ 2314 and 2315 as racketeering activity); Republic of Turkey v. OKS Partners, 797 F.

Supp. 64, 67 (D. Mass. 1992) (finding predicate act requirement satisfied when plaintiff

alleged that defendants had violated the NSPA by purchasing stolen coins in three

separate transaction and then selling two coins).

Berzack and Fox argue that Jumpsource did not sufficiently allege a "pattern" because

Jumpsource alleges just one criminal act involving them— that they canceled six orders they had

with Jumpsource and then later purchased the parts, allegedly stolen, from Fang.  [ECF No. 8-1

at 6].  Jumpsource counters that in addition to that conduct, the complaint alleges multiple

subsequent violations of the NSPA because Fox and Berzack resold the stolen parts they

purchased from Fang and continued to purchase and sell parts made from Jumpsource's stolen molds. [ECF No. 17 at 7–8].

Elektroteks and Guler similarly assert there is no pattern of conduct involving them because (1) the complaint alleges the molds and parts were stolen in 2016, before Elektroteks was incorporated, and (2) the wires identified by Jumpsource are not in any way connected to Elektroteks or Guler. [ECF No. 14 at 7–8]. As with Fox and Berzack, Jumpsource responds that Guler and Elektroteks committed multiple violations of the NSPA because they continue to operate a machinery parts distribution business that buys and sells stolen parts or parts made with stolen molds and have obtained proprietary plans regarding the Pfaff 5625 and the flange sewing machine. [ECF No. 18 at 10–12].

Taking Jumpsource's factual allegations as true and drawing reasonable inferences in its favor, Jumpsource has, albeit just barely, alleged more than one predicate act on the part of Fox, Elektroteks, Guler, and Berzack as the complaint supports the plausible inference that these defendants have each violated the NSPA more than once. [Compl. ¶¶ 190, 208–210]. The complaint alleges that Berzack, Fox, Guler, and Elektroteks violated the NSPA on multiple occasions by buying and selling parts known to have been stolen from Jumpsource or to have been made from molds stolen from Jumpsource. [Compl. ¶¶ 94–99, 168–178, 190, 208–210].

Fox and Berzack assert that the NSPA claims sound in fraud and are therefore subject to Federal Rule of Civil Procedure's Rule 9(b)'s heightened pleading standard, which Jumpsource has failed to satisfy. [ECF No. 8-1 at 6–8]. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the First Circuit, plaintiffs are

required to set out "the who, what, where, and when of the allegedly false or fraudulent representation," Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004), and "identify[] the basis for inferring scienter," Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd., 419 F. Supp. 3d 176, 189 (D. Mass. 2019) (quoting N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009)).

The Court disagrees that Rule 9(b) applies here. The language of the NSPA is broad and penalizes conduct even if not committed by fraud. See 18 U.S.C. § 2314 (criminalizing conduct of "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted *or* taken by fraud") (emphasis added); 18 U.S.C. § 2315 (criminalizing conduct of "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more . . . which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken"). Construing the allegations in Jumpsource's favor, Jumpsource pleads that the parts and molds were initially stolen by Fang, Polanco, and Peng from Jumpsource's factories, but the allegations do not hinge on the parts and molds being taken by fraud. [Compl. ¶¶ 9 ("Fang . . . stole the Jumpsource molds . . . ."), 38 (email stated that Fang had placed Jumpsource's molds in his warehouse), 46 (stating that Fang and Polanco took parts that Jumpsource had paid for), 126 (stating that $50,000 in parts were taken from Jumpsource's offices)]. Therefore, Jumpsource's NSPA allegations are not subject to Rule 9(b)'s heightened pleading requirement.

The Court next considers if these predicate acts are sufficiently related, and finds that this requirement is also met. Jumpsource has pled facts from which it can be

plausibly inferred that the predicate acts are related as the acts all have the same victim (Jumpsource), the same purpose (to destroy Jumpsource financially), and were accomplished using the same methods (by purchasing and/or selling parts stolen from Jumpsource or created with Jumpsource's stolen molds).  See Soto-Negron, 339 F.3d at 38.

Turning to continuity, Jumpsource has alleged facts to plausibly infer the "open-ended" continuity of the alleged scheme.  The continuity requirement can be satisfied by either the "closed-ended" approach, which refers to "to a closed period of repeated conduct" or the "open-ended" approach, which refers to "to past conduct that by its nature projects into the future with a threat of repetition."  H.J. Inc. v. NW Bell Tel. Co., 492 U.S. 229, 241 (1989).  "For open-ended continuity, Plaintiff must allege that the 'racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business.'"  Atl. Acquisitions, LLC v. J.H. Reid Gen. Contractor, 909 F. Supp. 2d 32, 36 (D. Mass. 2012) (quoting Giuliano v. Fulton, 399 F.3d 381, 387 (1st Cir. 2005)).

Jumpsource alleges that the predicate acts, which stem from Elektroteks, Guler, Fox and Berzack buying and/or selling stolen parts or parts manufactured with stolen Jumpsource molds, continue to this day.  [Compl. ¶¶ 190 (k), (m)].  Because the alleged pattern of racketeering activity is ongoing, and the purchase and sale of parts either stolen from Jumpsource or made from its stolen molds are alleged to be part of Fox and Elektroteks' way of doing business, the open-ended continuity requirement is satisfied.  See Atl. Acquisitions, LLC, 909 F. Supp. 2d at 36.[5]

---

[5] No party meaningfully engages with the continuity requirement, but to the extent Jumpsource relies on a "closed-ended" theory of continuity, that argument fails because the allegations

Therefore, Jumpsource has sufficiently alleged a pattern of racketeering activity under § 1962(c).

2.     Existence of an Enterprise

Berzack, Fox, Guler, and Elektroteks also argue that Jumpsource has not sufficiently alleged the existence of an enterprise because it failed to adequately plead the three required features of an "association-in-fact." [ECF No. 8-1 at 8; ECF No. 14 at 6–7].

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise based on an "association-in-fact" requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). "'Common purpose' does not mean commonality of motive, it means coordinated activity in pursuit of a common objective." In re Lupron Mktg. & Sales Pracs. Litig., 295 F. Supp. 2d 148, 173 (D. Mass. 2003).

Taking the allegations in the complaint as true, which the Court must at this stage, Jumpsource alleges that by 2018, Elektroteks, Guler, Berzack, and Fox, joined in an association-in-fact enterprise that also included Pierce, M.J. Pierce, Polanco, Polanco Corp., Fang, and Peng. [Compl. ¶¶ 188, 203]. This enterprise allegedly has the common and continuing purpose to destroy Jumpsource through (1) the conversion and misappropriation of Jumpsource's molds, parts, designs, and plans for a new sewing machine head and flange machine; and (2) the buying

---

amount to a "single, narrow scheme targeting few victims," which is insufficient to satisfy close-ended continuity. See Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 530 (1st Cir. 2015) (quoting Giuliano, 399 F.3d at 390).

and selling of parts stolen from Jumpsource or parts made from the molds that were stolen from Jumpsource. [Id. ¶¶ 188–89]. This is sufficient to plead longevity and a common purpose.

The complaint also alleges just enough facts to plausibly infer that the enterprise's members are related. The complaint outlines the role that each of these defendants has in the alleged scheme and the relationships between them. [Compl. ¶¶ 190–91]. Fox, through its association with Fang, Polanco, and M.J. Pierce, cancelled six parts orders with Jumpsource and instead knowingly purchased the parts after they had been stolen from Jumpsource, and continues to purchase parts created with stolen Jumpsource molds in order to resell them. [Id. ¶ 190(h), (m)]. Elektroteks, through its association with Polanco, Polanco Corp., Syring, Seth Service, Pierce, Fang and M.J. Pierce, gained control of Jumpsource's plans and designs for the Pfaff 5625 and the flange machine, purchased parts stolen from Jumpsource, and continues to purchase and sell parts made from stolen Jumpsource molds.[6] [Id. ¶¶ 190 (i)–(k)].

Accordingly, Fox, Berzack, Elektroteks, and Guler's motions to dismiss Count I are DENIED.

### B.       Count II: Use of Income, 18 U.S.C. § 1962(a)

To be liable, section 1962(a) requires a person to receive income from a pattern of racketeering activity and "to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in . . . interstate . . . commerce."

Sys. Mgmt., Inc. v. Loiselle, 91 F. Supp. 2d 401, 415 (D. Mass. 2000) (quoting 18 U.S.C. § 1962(a)). To survive a motion to dismiss, a plaintiff must allege more than injury from the predicate racketeering act. Lerner v. Colman, 485 F. Supp. 3d 319, 331 (D. Mass. 2020)

---

[6] The Court notes that Jumpsource's factual allegations to support the existence of an association-in-fact are thin and just barely sufficient to survive a motion to dismiss. Jumpsource's multiple alternative formulations of the alleged enterprise, see [Compl. ¶¶ 204–05], underscore the weakness of its enterprise allegations.

("[A]llegation that the defendant harmed the plaintiff solely and directly through a predicate act (as opposed to through the use of income derived from the racketeering) does not meet the requirement [of § 1962(a)]").

Jumpsource bases its § 1962(a) theory on the fact that Defendants, including Fox, Berzack, Guler, and Elektroteks, earned income from their transport, sale, and receipt of stolen parts and parts made with stolen molds, [Compl. ¶¶ 228–29], and then used that income "to control, establish, and operate the enterprise" that intends to destroy Jumpsource, [id. ¶ 230]. In its opposition, Jumpsource clarifies that Fox, Berzack, Guler, and Elektroteks earned income from selling the stolen parts and then used that money to pay other defendants involved in the scheme and to continue to buy other stolen parts or products made with stolen molds. [ECF No. 17 at 13; ECF No. 18 at 12–13]. Although it is a close call and the investments that Jumpsource alleges are not well detailed, Jumpsource has pled enough facts to state a claim under § 1962(a). Therefore, Fox, Elektroteks, Guler, and Berzack's motions to dismiss Count II are DENIED.

### C.    Count III: RICO Conspiracy, 18 U.S.C. § 1962(d)

To state a claim for conspiracy pursuant to 18 U.S.C. § 1962(d), a plaintiff must allege the elements of an underlying RICO claim, "plus allegations that each RICO co-conspirator knowingly joined the conspiracy and involved himself or herself, directly or indirectly, in the commission of at least two predicate offenses." Dickey v. Kennedy, 583 F. Supp. 2d 183, 188 (D. Mass. 2008) (citations and internal quotation marks omitted).

As described in Section III.A. supra, the Court finds that Jumpsource has stated a claim for an underlying RICO violation pursuant to §1962(c) against Fox, Berzack, Guler, and Elektroteks. With respect to Fox and Berzack, Jumpsource alleges that these defendants knew Fang had stolen its parts and molds and yet continued to buy parts they knew were made with the

stolen molds. [Compl. ¶¶ 95–97, 190(h)]. As to Guler and Elektroteks, Jumpsource alleges facts

to support the inference that they associated with Polanco, Polanco Corp., Seth Services, and

Syring, knowingly purchased stolen parts, and are knowingly selling parts made using stolen

molds. [Compl. ¶¶ 168, 190(i), 190(k)]. Taking the allegations as true, the complaint alleges the

facts required to state a RICO conspiracy claim against Berzack, Fox, Elektroteks, and Guler.

Therefore, Fox, Elektroteks, Guler, and Berzack's motions to dismiss Count III are <u>DENIED</u>.

### D. Count IV: Civil Conspiracy

> In Massachusetts, civil conspiracy may take the form of "concerted action," whereby liability is imposed on one individual for the tort of another. Because it is vicarious liability, this type of civil conspiracy requires an underlying tort [and t]he conspiracy consists in agreeing to, or assisting in, this underlying tort. To prove a "concerted action" conspiracy, a plaintiff must show that defendants either (1) acted in concert with or pursuant to a common design with the tortfeasor or (2) gave substantial assistance to the tortfeasor's conduct.

<u>Thomas v. Harrington</u>, 909 F.3d 483, 490 (1st Cir. 2018) (alterations in original) (internal

quotation marks and citations omitted). "Courts in this district have applied a low bar for

allegations of 'substantial assistance' sufficient to survive a motion to dismiss." <u>Brennan v.</u>

<u>Ferreira</u>, 251 F. Supp. 3d 338, 343 (D. Mass. 2017).

Berzack, Fox, Elektroteks, and Guler argue that this claim must be dismissed because

Jumpsource has not alleged an underlying tortious act. [ECF No. 8-1 at 11; ECF No. 14 at 10].

Contrary to this assertion, the complaint sufficiently alleges tortious conduct on the part of Fang,

Polanco, Peng, Pierce, and others. For example, the complaint details that Fang, Peng and

Polanco stole Jumpsource's parts and molds. <u>E.g.</u>, [Compl. ¶¶ 38–48, 72–88, 122–35, 155].

Elektroteks also contends that Jumpsource has failed to allege any agreement to assist in

the tortious conduct. [ECF No. 14 at 9–10]. "Civil conspiracy under Massachusetts law does

not require an express agreement." <u>Van Eperen v. Massachusetts Mut. Life Ins., Co.</u>, No. 3:14-

cv-13008, 2017 WL 9249439, at *17 (D. Mass. Feb. 28, 2017) (citing <u>Fiorillo v. Winiker</u>, 85 F.

Supp. 3d 565, 576 (D. Mass. 2015)), report and recommendation adopted, No. 14-cv-13008,

2017 WL 2362004 (D. Mass. May 31, 2017).  A plaintiff need only show that a defendant

provided substantial assistance "with the knowledge that such assistance is contributing to a

common tortious plan."  Koufos v. U.S. Bank, N.A., 939 F. Supp. 2d 40, 51 (D. Mass. 2013).

Jumpsource alleges that Elektroteks and Guler bought and sold parts stolen from

Jumpsource or made from molds stolen by Fang or Polanco.  [Compl. ¶¶ 168, 190(i), 190(k)].

As to Fox and Berzack, Jumpsource alleges that these defendants cancelled orders it had with

Jumpsource, and then knowingly purchased the parts that had been stolen by Fang, and continue

to buy stolen parts or parts made from molds stolen by Fang, Polanco, or M.J. Pierce.  [Id. ¶¶ 95–

97, 190(h), 190(m)].  Drawing every reasonable inference in Jumpsource's favor at this stage,

Jumpsource has alleged facts sufficient to show that Berzack, Fox, Guler, and Elektroteks

substantially assisted Fang, Polanco, and M.J. Pierce in carrying out tortious conduct.  This is

sufficient to state a claim for civil conspiracy.

Guler, Elektroteks, Fox, and Berzack's motions to dismiss Count IV are therefore

DENIED.

### E.  Count V: Conversion

To state a claim for conversion, a plaintiff must show that "(1) the defendant intentionally

and wrongfully exercised control over property owned or possessed by the plaintiff, (2) the

plaintiff was damaged and (3) if the defendant legitimately gained possession under a good-faith

claim of right, the plaintiff's demand for the return of the property was refused."  Children's

Hosp. Corp. v. Cakir, 183 F. Supp. 3d 242, 245 (D. Mass. 2016) (citing Evergreen Marine Corp.

v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993)).

Fox and Berzack argue that the complaint fails to allege that they knew anything about Jumpsource's stolen parts and molds, and that even the complaint demonstrates that they thought they were legitimately purchasing parts. [ECF No. 8-1 at 11–12]. Elektroteks and Guler argue this claim must fail because (1) the allegedly converted property (i.e., the molds and parts) was taken by non-parties Polanco, Fang, and Peng, not by Elektroteks or Guler; (2) that Jumpsource has already sued in a separate action for the theft of these parts and molds; and (3) any claims for the conversion of intangible property fails as a matter of law. [ECF No. 14 at 11–12].

As to Fox and Berzack, Jumpsource has alleged that those defendants (1) knew, because Jumpsource told them, that if they bought parts from Fang they would be buying property stolen from Jumpsource, and (2) thereafter knowingly bought parts stolen from Jumpsource. [Compl. ¶¶ 95–97, 190(h), 190(m)]. For Elektroteks and Guler, Jumpsource alleges that they knowingly bought stolen Jumpsource parts or parts made with the stolen molds. [Id. ¶¶ 168, 190(i), 190(k)]. Jumpsource's allegations are sufficient to withstand a motion to dismiss where it has pled that it owned the parts at issue and that Fox, Berzack, Guler, and Elektroteks took control of the stolen parts.

Accordingly, Guler, Elektroteks, Fox, and Berzack's motions to dismiss Count V are DENIED to the extent the conversion claim is based on tangible assets, such as the parts.

As a matter of law, Jumpsource cannot recover for the conversion of intangible property. Blake v. Pro. Coin Grading Serv., 898 F. Supp. 2d 365, 386 (D. Mass. 2012) ("This Court has consistently held that a plaintiff is not entitled to recover for conversion of intangible property."). To the extent Jumpsource's claim is premised on the theft of intangible property, [Compl. ¶ 252 (bringing claim for conversion of "intangible assets")], the motions to dismiss Count V are GRANTED.

## F.     Count VI: Massachusetts General Laws Chapter 93A

> Chapter 93A proscribes all unfair methods of competition and unfair or deceptive acts or practices [made] in the conduct of any trade or commerce.  A practice or act is unfair under Chapter 93A if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people. . . .

CardiAQ Valve Techs., Inc. v. Neovasc Inc., No. 14-cv-12405, 2016 WL 1642573, at *5

(D. Mass. Apr. 25, 2016) (alterations in original) (citations and internal quotation marks

omitted).  "[A]t the pleading stage a plaintiff need do no more than allege conduct that, if proven,

could be found to constitute an unfair or deceptive practice."  Aware, Inc. v. Centillium

Commc'ns, Inc., 604 F. Supp. 2d 306, 312 (D. Mass. 2009).

Fox and Berzack contend that the Chapter 93A claim against them must be dismissed

because there is no allegation that they knew any parts were stolen or made from stolen molds.

[ECF No. 8-1 at 12].  Although they may contest the veracity of the allegation, the complaint

does explicitly allege that Fox and Berzack knew they were purchasing stolen parts, [Compl.

¶¶ 95–97], and that they continue to purchase and sell parts knowing them to have been made

using stolen molds.  [Id. ¶ 190(m)].  Fox and Berzack also argue that this allegation is

contradicted by others in the complaint that say that Fox and Berzack represented that they

believed their supplier was using its own molds.  [ECF No. 8-1 at 12].  Jumpsource maintains

that the only possible supplier of Jumpsource products that Fox and Berzack would know is

Fang, who stole the parts and molds from Jumpsource.  [ECF No. 17 at 17].  Taking the

allegations as true, they are sufficient to state a claim that Fox and Berzack engaged in unfair or

deceptive practices.

Guler and Elektroteks also argue that the Chapter 93A claim against them cannot survive

because (1) the allegations are conclusory and fail for the same reasons as Jumpsource's other

claims (e.g., RICO, defamation), and (2) there is no connection between Massachusetts and their conduct.  [ECF No. 14 at 9–11].  Jumpsource responds, in part, that Elektroteks employs Polanco, who resides and conducts business in Massachusetts, for the purpose of selling the stolen parts or parts made with the stolen molds.  [ECF No. 18 at 17 n.18].

The complaint alleges facts sufficient to plausibly infer that Guler and Elektroteks knowingly bought and sold parts that were either stolen or made with stolen molds.  [Compl. ¶¶ 168, 190(i), 190(k)].  At this stage, these allegations, if proven to be true, could be found to constitute a deceptive or unfair practice.  See Aware, Inc., 604 F. Supp. 2d at 312.

As to the argument regarding conduct in Massachusetts, Chapter 93A § 11, the subsection on which Elektroteks and Guler seem to rely, provides that

> [n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.  For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

Mass. Gen. Laws ch. 93A, § 11.  The Massachusetts Supreme Judicial Court has explained that courts "should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 473 (2003).  Accordingly, it would be premature for the Court to decide on this limited record whether the Chapter 93A claims are foreclosed on that ground.

Thus, Guler, Elektroteks, Fox, and Berzack's motions to dismiss Count VI are DENIED.

### G. Count VII: Trade Secret Misappropriation

Elektroteks and Guler argue that Jumpsource's claim of trade secret misappropriation under Massachusetts General Laws Chapter 93 § 42 must be dismissed. [ECF No. 14 at 12–14]. Jumpsource has agreed to dismiss this claim. [ECF No. 18 at 1 n.1].

Accordingly, Elektroteks and Guler's motion to dismiss Count VII is <u>GRANTED</u> as unopposed.

### H. Count VIII: Breach of Contract

> In order to state a viable breach of contract claim under Massachusetts law, plaintiffs must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach. Plaintiffs also must do more than allege, in conclusory fashion, that the defendant breached the contract, by describing, with "substantial certainty," the specific contractual promise the defendant failed to keep.

<u>Brooks v. AIG SunAmerica Life Assur. Co.</u>, 480 F.3d 579, 586 (1st Cir. 2007) (citations omitted). Although the general rule is that plaintiffs must point to specific contractual obligations that were allegedly breached, <u>see</u> <u>Doyle v. Hasbro, Inc.</u>, 103 F.3d 186, 195 (1st Cir. 1996), the First Circuit has encouraged courts to allow breach of contract claims to survive motions to dismiss if the contract could plausibly be read in the plaintiff's favor and the complaint's allegations suggest a breach, <u>Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d 224, 233 (1st Cir. 2013).

Fox contends that Jumpsource failed to state a claim for breach of contract because the complaint does not allege with "substantial certainty" that Fox breached a contract because it does not adequately plead that Fox bought Jumpsource parts from another supplier. [ECF No. 8-1 at 13].

Jumpsource alleges that (1) on November 10, 2015, Fox and Jumpsource entered into the Fox NCA, which prohibited Fox from using Fang's identity for purposes other than doing

business with Jumpsource, [Compl. ¶¶ 67–68]; (2) the Fox NCA also prohibited Fox from purchasing Jumpsource's parts from any other source, [id.]; and (3) Fox breached the Fox NCA by (i) cancelling its orders with Jumpsource at the same time Jumpsource learned that Fang quit, [id. ¶ 91];[7] (ii) communicating with Fang to purchase the goods stolen from Jumpsource, [id. ¶ 97]; and (iii) doing business with Fang in breach of its agreement not to purchase specially made Jumpsource parts from any other source, [id. ¶¶ 96–98].[8]

At this stage of the proceedings, the Court must accept the factual allegations as true. Accordingly, Fox's motion to dismiss Count VIII is DENIED.

## I.     Count IX: Common Law Trademark Infringement

"To establish trademark infringement . . . , a plaintiff must prove that: (1) the plaintiff owns and uses the disputed marks; (2) the defendant used similar or identical marks without permission; and (3) unauthorized use likely confused consumers, harming the plaintiff (e.g., lost sales)." Lyons v. Gillette, 882 F. Supp. 2d 217, 226 (D. Mass. 2012) (stating elements of

---

[7] Jumpsource argues that this allegation implies "that Fox communicated with Fang regarding the stolen parts before cancelling its order." [ECF No. 17 at 18].

[8] In their motion to strike, Fox and Berzack raise for the first time the argument that the Fox NCA does not actually contain any provision that prohibits Fox from buying Jumpsource parts from any other source. [ECF No. 21 at 1–2]. Though not entirely clear, Jumpsource appears to contend that because the Fox NCA bars Fox from using any proprietary information it learned in the course of the parties' relationship, it necessarily prohibits buying Jumpsource parts from any other supplier because Fang is the only other possible supplier of Jumpsource parts and Fang's identity would need to be used in order to purchase parts from him. [ECF No. 22 at 6–8]. The Court finds that the contract could plausibly be read in Jumpsource's favor and will not dismiss the count at this stage. See Young, 717 F.3d. at 233. Notwithstanding that provision, Fox does not contest that the Fox NCA prohibits it from using Fang's identity for purposes other than doing business with Jumpsource and as described supra, Jumpsource has also adequately pled a breach of that contract provision.

trademark infringement claim under the Lanham Act claim (citing <u>Venture Tape Corp. v.</u> <u>McGills Glass Warehouse</u>, 540 F.3d 56, 60 (1st Cir. 2008))).[9]

Elektroteks and Guler argue that Jumpsource's alleged trademark, a "j," does not have the distinctiveness required to be protected by trademark law, no allegations suggest Elektroteks and Guler are profiting from Jumpsource's trademark, and no allegations show actual customer confusion or a likelihood of confusion. [ECF No. 14 at 14–17]. Fox and Berzack contend that Jumpsource has not alleged that Fox or Berzack were selling parts with its trademark or logo, and for this reason the claim must be dismissed. [ECF No. 8-1 at 14].

The Court agrees that Jumpsource's trademark infringement claim against Fox and Berzack must be dismissed. The complaint has not pled facts that support the inference that Fox or Berzack are selling parts with a "j" mark or Jumpsource logo. Although the complaint alleges Fox and Berzack buy and sell stolen Jumpsource parts and parts made from stolen Jumpsource molds, it does not necessarily follow that these parts had the logo or "j" mark. The complaint itself explains that only some Jumpsource parts and molds have the "j" mark or the Jumpsource logo. [Compl. ¶¶ 167, 284–85]. Absent any allegation that Fox or Berzack are actually using Jumpsource's mark without permission, the claim fails. <u>Lyons</u>, 882 F. Supp. 2d at 226.

On the other hand, Jumpsource has stated a claim for common law trademark infringement against Elektroteks and Guler. The complaint specifically alleges that Elektroteks and/or its agents are selling parts with the "j" mark or Jumpsource logo on them. [Compl. ¶¶ 164, 166–67, 171–72]. Further, the complaint alleges that Jumpsource owns and uses the "j"

---

[9] The parties appear to agree that the elements of a federal trademark infringement claim are the same as those required for a common law trademark infringement claim. <u>See</u> <u>Xiao Wei Yang</u> <u>Catering Linkage in Inner Mongolia Co. Ltd v. Inner Mongolia Xiao Wei Yang USA, Inc.</u>, 340 F. Supp. 3d 70, 77 (D. Mass. 2018).

mark and Jumpsource logo, and that they are valid marks.  [Compl. ¶¶ 284–85].  Regarding the likelihood of confusion, Elektroteks and Jumpsource provide the same goods in the same industry, and the marks used by Elektroteks are allegedly identical to Jumpsource's marks.  Even though Jumpsource has not pled any specific instance of confusion, in such circumstances confusion might occur.  See Stratus Techs. Bermuda Ltd v. EnStratus Networks, LLC, 795 F. Supp. 2d 166, 169 (D. Mass. 2011).   Finally, although Guler and Elektroteks may dispute the distinctiveness of the "j" and Jumpsource's logo, such factual disputes cannot be resolved on a motion to dismiss.  See id.

Accordingly, Fox and Berzack's motion to dismiss Count IX is GRANTED and Guler and Elektroteks' motion to dismiss Count IX is DENIED.

### J.      Count X:  Interference with Advantageous Relationship

To prevail on a claim for tortious interference with an advantageous business relationship the plaintiff must demonstrate

> (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.

Am. Priv. Line Servs., Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992) (citing United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 12 (1990)).

Jumpsource has not pled sufficient facts to show that Fox, Berzack, Elektroteks, and Guler have interfered with its advantageous business relationships.  Although the complaint broadly states that "Defendants have interfered in advantageous relations as between [Jumpsource] and its customers, as well as its manufacturers and other vendors" and that "[a]s a result, [Jumpsource] has suffered grievous harm," [Compl. ¶¶ 295–96], the complaint fails to allege facts identifying any existing or prospective relations that were impacted by these four

defendants' conduct specifically. Further, even if their conduct did interfere with advantageous relations, there is no allegation that these defendants knew about the existing or prospective relationships that their actions supposedly interfered with.

Accordingly, Fox, Berzack, Guler, and Elektroteks' motions to dismiss Count X are GRANTED.

### K.  Count XII: Defamation

> To succeed on a defamation claim under Massachusetts law, a plaintiff must show that the defendant was at fault for the publication of a false statement of and concerning the plaintiff which was capable of damaging his or her reputation in the community and which either caused economic loss or is actionable without proof of economic loss.

Stanton v. Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006) (citing White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004)). A statement is defamatory if it "would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community," and a statement is published if it is transmitted to "even one person other than the plaintiff." Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 553–54 (Mass. 2004).

Here, Jumpsource alleges that Guler called Polanco and that Polanco told Freeman, a third party, that "the Porters were no good," had nothing to sell, and were "out of business." [Compl. ¶ 180]. Elektroteks and Guler argue in relevant part that the defamation claim must be dismissed because (1) the statement was made by Polanco and is not attributable to anyone at Elektroteks; (2) there is no evidence the statement was false; and (3) public records show a reasonable basis for the statement because Jumpsource was both struggling financially and involved in other lawsuits. [ECF No. 14 at 18–20].

These reasons do not support dismissal of Jumpsource's claim. First, based on the allegations in the complaint, it is plausible to infer that the statement is attributable to Elektroteks because Polanco was acting as Elektroteks' agent at the time the statement was made. See [Compl. ¶¶ 164, 166, 176–77 (alleging Polanco's LinkedIn profile connected him with Elektroteks)]. Second, Jumpsource has pled that it remains in business and was in business in 2018 when Polanco made his statement, which is sufficient to allege that the statements at issue were false. [Id. ¶ 1]. Finally, the public records that Guler and Elektroteks reference do not definitively show that Jumpsource was not in business in 2018 when the statement was made. Accordingly, those records do not provide a "reasonable basis in fact" for Polanco's statement to the effect that Jumpsource was out of business in light of Jumpsource's factual allegations that it was, in fact, in business at that time.

Accordingly, Guler and Elektroteks' motion to dismiss Count XII is <u>DENIED</u>.

### L.      Claims Against Guler Individually

Guler argues, without citing any case law, that all claims against him in an individual capacity must be dismissed because "[i]t is axiomatic that a shareholder or LLC member cannot be personally liable for the debts of his corporation or LLC" and that "[n]othing in the Complaint allows Jumpsource to disregard the corporate form." [ECF No. 14 at 20]. He also argues that "there are no allegations claiming that [he] personally engaged in any wrongdoing." [Id.]. The Court will not dismiss all claims against Guler on these grounds. First, "[u]nder Massachusetts law, corporate officers are personally liable for any tortious activity in which they personally participate." <u>Frontier Mgmt. Co. v. Balboa Ins. Co.</u>, 658 F. Supp. 987, 991 (D. Mass. 1986) (citing <u>LaClair v. Silberline Mfg. Co.</u>, 393 N.E.2d 867, 872 (Mass. 1979)). Second, the

complaint adequately alleges that Guler was involved in conduct underlying the tort and RICO claims. [Compl. ¶¶ 54, 59–60, 168–69, 180–82, 186, 191].

## IV. MOTION TO STRIKE

Fox and Berzack move to strike Exhibits B, D, and F of Jumpsource's opposition to its motion to dismiss. [ECF No. 21]. For Exhibit B, a copy of the Fox NCA, Fox and Berzack ask the Court to take judicial notice of the fact that there is an alleged discrepancy between the text of the Fox NCA and allegations in the complaint, and to otherwise ignore the document. [Id. at 2]. For Exhibit D, a 2016 email from Fang, Fox and Berzack argue that Jumpsource mislabels this exhibit as a "notice of resignation and theft of parts" in its Exhibits Table of Contents. [Id.]. The Court understands Fox and Berzack to be arguing that there is "no reason for the Court to consider the [2016] email" because the email makes no mention of a "theft of parts" and is not cited in the complaint to support any allegations regarding a theft of parts. [Id.]. Finally, for Exhibit F, affidavits from Pierce and Polanco that were filed in a related state court litigation, Fox and Berzack ask the Court to not consider them because they contain extraneous information, and do not support at least one of the allegations for which Jumpsource cites it. [Id.].

As explained above, when "ruling on a motion to dismiss, a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs" and, in doing so, a court may consider documents that are filed with the complaint or expressly incorporated therein. Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33–34 (1st Cir. 2001).

Although they were not appended to the complaint, the documents that were submitted with Jumpsource's opposition brief as Exhibits B, D, and F are all explicitly referenced in the

complaint. [Compl. ¶¶ 67–69 (referencing the Fox NCA, which is Exhibit B), ¶¶ 87–88 (referencing September 29, 2016 email from Fang, which is Exhibit D), ¶¶ 114–18 (referencing the Polanco and Pierce Affidavits submitted in the Essex Superior Court litigation, which are Exhibit F)]. Therefore, because the exhibits can properly be considered by the Court when ruling on a motion to dismiss, the motion to strike is <u>DENIED</u>.

## V.      CONCLUSION

Accordingly, both motions to dismiss, [ECF Nos. 8, 13], are <u>GRANTED</u> in part and <u>DENIED</u> in part. Count V is <u>DISMISSED</u> as to all Defendants to the extent it asserts a claim for conversion of intangible assets. Count VII, which was only asserted against Guler and Elektroteks, is <u>DISMISSED</u>. Count IX is <u>DISMISSED</u> as to Fox and Berzack. Count X is <u>DISMISSED</u> as to Fox, Guler, Berzack, and Elektroteks. All other counts remain. Fox and Berzack's motion to strike, [ECF No. 21], is <u>DENIED</u>. The Court notes that the civil RICO claims barely survived the motion to dismiss and suggests that the parties chart their litigation strategy with that in mind.

Finally, the notice of removal attests that Fox, Berzack, Guler, and Elektroteks have all been properly served, but also states that Seth Service, Syring, and Polanco Corp. have not been served. [ECF No. 1 at 2]. Jumpsource has not otherwise filed any proof of service with the Court. Within fourteen (14) days of the entry of this Order, Jumpsource is ordered to file proof of timely service or show cause, in writing, why this case should not be dismissed as to Seth Service, Syring, and Polanco Corp. for failure to effect proper service.

**SO ORDERED.**

July 8, 2021                                                    /s/ Allison D. Burroughs
                                                                      ALLISON D. BURROUGHS
                                                                      U.S. DISTRICT JUDGE